## Jeffries' Estate

*Moore & Gourley*, for petitioners.

*R. W. Knox, J. R. McCreight*, and *C. L. V. Achson*, for respondents.

CRUMRINE, P. J., July 13, 1938.—B. F. Jeffries died July 4, 1907.

On April 6, 1907, about three months before his death, he gave to his wife, Annie Jeffries, a judgment note in the sum of $5,000. This note was not entered.

By his will, Mr. Jeffries provided as follows:

"Item Two. I direct my Executor to pay to my wife Annie Jeffries the sum of Five Thousand Dollars for which she has a note dated April 6, 1907, I make this Item for fear said note might get lost or otherwise destroyed but if she should receive the Five Thousand Dollars before my Decease then this Item is of no avail and void."

In 1909, Annie Jeffries brought suit on the note, against herself as executrix, securing a verdict in the sum of $5,805, upon which verdict a judgment was entered on February 1, 1911.

On April 9, 1914, a scire facias was issued to revive, and judgment of revival was finally entered on June 5, 1914, in the sum of $7,343.52.

On November 11, 1919, more than five years from the last revival, another scire facias was issued, judgment entered,. and by subsequent revivals, all within the required period, the judgment has been carried down to the present time.

On October 20, 1921, the judgment was duly assigned to Russell Jeffries, its present holder.

Annie Jeffries as executrix of the will of B. F. Jeffries had in her hands sufficient funds with which to pay this judgment, but for some reason of her own failed to do so.

The real estate of decedent was never sold and the administrator d. b. n. c. t. a., now presents a petition to sell it for the payment of debts, this judgment being the only "debt" set out. The answer denies that the judgment is a lien, and therefore avers that the court has no jurisdiction to order the sale. From the remarks of counsel it seems that the proceeding is really a consentable one for the purpose of ascertaining the status of the judgment.

The first question then is: Does the fact that more than five years elapsed between the entry of judgment of revival on June 5, 1914, and the issuance of another scire facias to revive on November 11, 1919, destroy the lien of the judgment, as against land still in the hands of devisees?

It is well settled as to the ordinary judgment inter vivos that, while as to purchasers and intervening encumbrancers the lien expires at the end of five years if not revived strictly in accordance with the provisions of the statutes, it retains its lien as against the defendant and his volunteer heirs and devisees, subject only to a presumption of payment after 20 years: Fetterman v. Murphy, 4 Watts 424; Bindley's Appeal, 69 Pa. 295; Brown's Appeal, 91 Pa. 485; McCahan v. Elliott, 103 Pa. 634; Shannon v. Newton, 132 Pa. 375; Colenburg et al. v. Venter, 173 Pa. 113; Phillips' Estate, 47 Pitts (O. S.) 77.

On principle, it would seem that a judgment is a judgment, and that there should be no difference, as to the

perpetuation of lien, between one inter vivos and one secured against the estate of a decedent, after his death. Nevertheless, the contrary seems to be true, and for reasons largely historical. I know of no recent case deciding the precise point, hence it is necessary to refer to some of the early statutes and their construction by the old cases. The Act of April 19, 1794, 3 Sm. L. 143, sec. 2, provides that:

"Whereas inconveniences may arise from the debts of deceased persons remaining a lien on their lands and tenements an indefinite period of time after their decease, whereby *bona fide* purchasers may be injured, and titles become insecure: Therefore, *Be it enacted by the authority aforesaid,* That no such debts, except they be secured by mortgage, judgment, recognizance, or other record, shall remain a lien on said lands and tenements. longer than seven years after the decease of such debtor, unless . . . an action for the recovery thereof commenced and duly prosecuted against his or her executors. or administrators, within the said period of seven years . . . shall be filed . . .".

This provision, with the exception of certain words indicated by the ellipsis, was reënacted in the Act of April 4, 1797, 3 Sm. L. 296, as section IV.

Just one year later, was enacted the original statute providing for the revival, by writ of scire facias, of general judgment liens, which, with its supplements and amendments, is still in force: Act of April 4, 1798, 3. Sm. L. 331, 12 PS §864. The preamble, with section II of that act, read as follows:

"*Whereas* the provision heretofore made by law for preventing the risque and inconvenience to purchasers of real estate, by suffering judgments to remain a lien for an indefinite length of time, without any process to continue or revive the same, hath not been effectual: Therefore . . .

"Sect. II. And be it further enacted . . . That no judgment hereafter entered in any court of record . . .

shall continue a lien on the real estate of the person against whom such judgment may be entered, during a longer term than five years from the first return day of the term of which such judgment may be so entered, unless the person who may obtain such judgment . . . shall, within the said term of five years, sue out a writ of *scire facias,* to revive the same."

These two acts, so close as to the time of their enactment and so similar as to the purpose, evidently caused confusion and they soon became the subject of construction by the courts, not always too clear.

It was early decided that the limitation of the Act of 1798, supra, applied not only to purchasers, but to subsequent judgment creditors: Bank of North America v. Fitzsimons, 3 Binn. (Pa.) 342. But the limit of its protection was fixed at this point, and in Aurand's Appeal, 34 Pa. 151, it was said:

"By interpretation of the Statute of Westm. 2, a judgment binds the land had at the date of it, and without limitation of time. The creditor might have execution of it in the hands of the debtor at any indefinite period while the judgment remained unpaid. Thus stood the law in Pennsylvania till the statute of 1798 restrained the lien of a judgment to a period of five years; but only in favour of purchasers from the debtor, and judgment-creditors in his lifetime: it left it without bound or limit against every one else."

Meanwhile, in Kerper v. Hoch, 1 Watts 9 (1832), it was squarely decided that under the Act of 1797, supra, the failure of a creditor of decedent to preserve his lien by bringing action within the seven years period, not only discharged the lien of decedent's debt as against bona fide purchasers, but as against the creditors of heirs and devisees and *as against the heirs and devisees themselves.* The opinion of Mr. Justice Kennedy is long and goes at length into the reasons for the Act of 1797, supra—the necessity of freeing lands from secret liens, so that they may be freely alienable. Having decided that the limita-

tion of the act protects *creditors* of devisees and legatees, he says (p. 18):

"Having protected the creditors of the heirs and devisees, I am not only willing, but feel myself bound by the provisions of the act, and what has been most indubitably the policy of the state, to extend the benefit of the limitation to the heirs and devisees, in order to make them secure in their titles. If such be not the true construction, a state of things must often arise that the legislature intended to provide against, and which would have required their direction, if it had not been thought at the time, that their act would in future prevent it."

This case specifically overrules Bruch, etc., v. Lantz, etc., et al., 2 Rawle, 392.

In Trevor's Admrs. v. Ellenberger's Execs., 2 P. & W. 94 (1830), it was decided that, since the lien of decedent's debts attaches to his land by reason of the law which makes it, substantially, a fund for the payment of his debts, nothing was added to the lien by reason of a judgment against his personal representatives, and that the scire facias provided by the Act of 1798, supra, applied only to judgments inter vivos, and was not applicable. It was held, however, that a scire facias might be issued to prolong the existing lien.

In Penn v. Hamilton, 2 Watts 53, still cited as a leading case, Mr. Chief Justice Gibson elaborated on the rule of the preceding case, and, while holding that the Act of 1798, supra, had no direct application, concluded that since the object of both the Acts of 1797 and 1798 was to require notice to be given by creditors, the practice of revival by scire facias prescribed by the Act of 1798, could and should be adopted by analogy to preserve the lien provided for by the Act of 1797.

It is to be noted that the chief justice expressed his dissatisfaction with the finding in Kerper v. Hoch, supra, in extending the protection of the act to volunteers, but acquiesced in the decision.

In Fetterman v. Murphy, supra, cited above for the proposition that the lien of a judgment inter vivos continues indefinitely against volunteer heirs and devisees —Chief Justice Gibson adds a supplemental opinion to explain that this decision did not affect the rule of Penn v. Hamilton, supra, saying, in part (p. 429) :

"It is proper to add that we entertain not a doubt of the doctrine in Penn v. Hamilton. In that case, to prevent the mischief which springs from liens of unlimited duration, we infused into the act of 1797 for limiting the lien of a decedent's debts, principles borrowed from the act of 1798 for limiting the lien of judgments, because the direct provisions of the latter could not be applied to judgments which have no lien to be limited; and such are judgments obtained against the representatives of a decedent, as appears in Wootering v. Stewart, 2 Yeates 483; Scott v. Ramsey, 1 Binn, 221; Prevost v. Nicholls, 4 Yeates 487, and Trevor v. Ellenberger, 2 P. & W. 96. . . . In Penn v. Hamilton, we did but treat the judgments as having been unattended with lien all along; and to the independent lien of the debt we but applied the principle of Kerper v. Hoch, 1 Watts 9, which puts volunteers, under the act of 1797, on a footing with purchasers and creditors; a principle not introduced into the construction of the act of 1798, as is apparent in the opinion just delivered, the effect of which, in respect of the doctrine of Penn v. Hamilton, without a word of explanation, might be misapprehended."

These early cases have been cited and quoted in considerable detail for the purpose of showing that while the practice as to the revival of the two classes of judgments gradually became the same, the court continued to recognize the liens themselves as essentially different in character. For the purposes of our consideration, they establish two important conclusions: (1) That the Act of 1797 is not only a statute of limitation but one of "repose"; and (2) that the effect of a judgment under it is not the creation of a lien (as in the case of a judgment

inter vivos) but to prevent the lapse of the statutory lien accruing from the death of the debtor—which principles are still recognized by later cases: Kirk v. Van Horn et al., 265 Pa. 549; Brennan's Estate, 277 Pa. 509; Central-Penn National Bank of Phila. v. Culp et al., 320 Pa. 358.

While the result reached by this line of cases is good, for the reasons given by Mr. Justice Kennedy in Kerper v. Hoch, supra (which case, incidentally, Mr. Justice Sharswood, in Bindley's Appeal, 69 Pa. 295, 299, says was "considered by many of the foremost men of the bench and the bar, at the time, to have been rather an act of judicial legislation than of construction"), the reasoning which distinguishes the two lines of cases would seem to be rather tenuous. As Mr. Chief Justice Gibson remarked in Penn v. Hamilton, supra (p. 58) :

"It was of little moment as to consequences, whether the lien had its root in a judgment, or was but dependent on one for its continuance, as the mischief from an indefinite duration of it would be the same . . . In restraining the lien of a judgment, the legislature certainly did not purposely omit a like provision for a lien depending on a judgment for its continuance, merely because its origin is elsewhere."

And that such a distinction between the effect of a judgment procured against a decedent in his lifetime and one after death against his personal representative, should persist in our statutes and decisions for more than a hundred years is remarkable, to say the least. Nevertheless, it seems to be well recognized, although I have found no late case on the precise point.

The latest, and most directly in point, is Williamson's Appeal, 1 Monaghan (Pa.) 241. The short opinion is as follows:

"Per Curiam, March 4, 1889.—This was not a judgment recovered against the decedent in his lifetime, but against his administrator after his death. Had it been a judgment against the decedent, it must be conceded it

would remain a lien upon his land in the hands of his heirs. It was recovered against the administrator May 20, 1878. Judgment was obtained against the heirs Jan. 15, 1879, and it was therefore a valid lien against the lands of the decedent for five years from that date. The lien expired Jan. 14, 1884. It could have been continued by a scire facias, but this was not done, and the lien upon the land was lost. The learned auditor correctly held that, as the judgment had lost its lien when the land was sold, it could not participate in the distribution of the fund raised from the sale. The appellant contends, however, that, if the lien is gone, the order of the orphans' court for a sale of the land for the payment of debts, made in 1874, when the debt was a lien, has the effect of a trust to pay all debts existing at that time. This position cannot be sustained. An order of sale for the payment of debts creates no trust; it is a mere authority to sell for the payment of such debts as may be a lien upon the lands. If, pending the execution of the order, a lien is suffered to expire, it ceases to be operative so far as the lands are concerned, and the holder must look to the personal estate. Nor is there any force in the position that the lien was good against Robert Gray and Rebecca Tyler, parties to the scire facias. The judgment against them was de terris; it was not a personal judgment."

Many more cases might be cited, but the discussion of this point is already too long. Most of them are included in the comprehensive brief submitted by counsel for the judgment creditor, and Mr. McCreight himself has fairly pointed out the way in which they are distinguishable.

On this point, I find that a failure to revive the lien of the judgment in question before June 5, 1919, operated to discharge it as of that date, and that the devisees held it free from such lien.

The result of course is that, there being now no lien to confer jurisdiction to order a sale for payment of debts, the petition for such sale is dismissed.

In this same estate, to no. 23 February term, 1938, Russell B. Jeffries presented a petition for citation on the administrator d. b. n. c. t. a., to show cause why he should not proceed to sell the real estate of decedent under the provisions of the will. The questions raised in that proceeding are discussed in an adjudication filed to that number and term and the foregoing discussion and the decree entered below are in nowise to be taken as affecting or in any manner prejudicing the rights of the parties in the other proceeding.

### Decree

And now, July 13, 1938, for the reasons above given, the petition to sell the real estate of decedent for the payment of debts is refused and dismissed at the costs of the estate.